EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION and Sister Eliza-
beth McDonough, Plaintiffs,

v.

The CATHOLIC UNIVERSITY
OF AMERICA, Defendant.

Civ. A. No. 92–2449–LFO.

United States District Court,
District of Columbia.

June 29, 1994.

Gerald S. Kiel, Debra M. Lawrence, Veronica Venture, Baltimore, MD, for plaintiffs EEOC.

Douglas B. Miskin, Bonnie Y. Hockman, Melrod, Redman & Gartlan, Washington, DC, for Sister McDonough.

James B. Sarsfield, Hamilton & Hamilton, Washington, DC, for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This is an employment discrimination action against Catholic University of America filed on October 30, 1992 by Sister Elizabeth McDonough and the Equal Employment Opportunity Commission ("the EEOC") alleging sex discrimination and retaliation. Before authorizing and filing the complaint, the EEOC, acting on a charge brought by Sister McDonough on January 18, 1990, conducted an investigation that ended on April 23, 1992. After protracted pretrial proceedings before Judge Charles Richey and myself to simplify the proof process and narrow the issues, the case went to trial without a jury on November 3, 1993, and concluded on November 10, 1993.[1] The parties called eighteen witnesses, fourteen of whom were priests or members of a religious order, and several were subjected to very vigorous cross-examination. Thereafter, the parties filed proposed findings and conclusions. Later, at my request, they filed briefs addressing the question whether the First Amendment precludes maintenance and adjudication of Sister McDonough's claims. I now conclude that the First Amendment precludes review of Sister McDonough's sex discrimination and retaliation claims under Title VII.

### I.

#### A.

Sister McDonough presently lives at the St. Bernadette Convent in Silver Spring, Maryland, and serves as Canonical Consultant and Tribunal Judge in the Office of Cardinal Hickey, Archbishop of Washington and Chancellor of Catholic University. She has had a life-long and devoted association with Catholic Church institutions. After high school she entered Albertus Magnus College, a small college for women operated by the Dominican Sisters of St. Mary of the Springs in New Haven, Connecticut. In her first year there she "experienced what is referred to in Catholic circles as the call to a religious vocation and wanted 'to enter the convent,' that is, to become a member of the community of Sisters who owned and operated Albertus Magnus College." Affidavit of Sister Elizabeth McDonough, O.P., Pl.'s Ex. 88 at ¶ 4. According to Sister McDonough, "[t]he Dominican Order was founded ... in the ... 13th century for the purpose of combatting then prevalent heresies by preaching the truths of the Catholic faith. Thus, it is known officially as the 'Order of Preachers' and its members use the initials 'O.P.' after their names." Id. at ¶ 8. Dominicans are divided into three major segments or orders. Priests are the first order. The second is comprised of cloistered contemplative nuns in monasteries. The third order, to which Sister McDonough belongs, "consists of congregations of sisters engaged in various apostolic[2] works." Id. (emphasis added). In 1963, Sister McDonough entered the Congregation of St. Mary of the Springs, a religious community with headquarters in Columbus, Ohio. In 1969, she took an oath to lead a consecrated life, "profess[ing] vows of poverty, chastity and obedience." Id. at ¶ 10. As a member she "is required to live according to the

---

1. Closing arguments were held on January 7, 1994.

2. Dictionary definitions of "apostolic" include "Of, or relating to the Catholic Apostolic Church." Webster's New International Dictionary, 128 (1958).

approved internal norms of the group and is subject to the direct authority of its legitimate superiors in regard to internal discipline *and external works.*" *Id.* at ¶ 5 (emphasis added). According to Sister McDonough, membership in a religious [3] community is a commitment "to a life of prayer and/or apostolic service along with other similarly motivated people ... [who] are then constituted as an identifiable subgroup that usually lives, prays and works in accord with a specific rule or life and organizational plan that has been officially recognized and sanctioned by competent ecclesiastical authority." *Id.*

Prior to taking her vows, Sister McDonough completed "a program of initial formation": teaching grade school for one year each in Hartford, Connecticut and Columbus, Ohio, presumably in Catholic schools. *Id.* at ¶ 10. In 1967, she earned a master's degree with a major in mathematics and a minor in theology from Ohio Dominican College. Immediately thereafter, she was assigned by her community's "major" or "ecclesiastical" superior to teach math and science at a high school owned and operated by her community in New Haven, Connecticut and to live with twenty-five other "Sisters at St. Mary's Convent in New Haven." *Id.* at ¶ 11. From 1970 through 1978, she taught math and religion at Northwest Catholic High School in West Hartford, Connecticut and then at Fisher Catholic High School in Lancaster, Ohio. *See id.*

In 1976, Sister McDonough's major superior asked if she would consider pursuing a degree in canon law,[4] a discipline recently opened to women, "an area of study akin to Dominican tradition," and one for which Sister McDonough might have a certain aptitude. *Id.* at ¶ 12. In 1978, after obtaining a full tuition scholarship, Sister McDonough began "a semester of theology courses in the Theology Department of the School of Religious Studies at CUA." *Id.* at ¶ 16. In January 1979, she transferred to the Canon Law Department and entered a program leading to a "Master of Church Administration degree." *Id.* at 18.

During her student years, among other activities, Sister McDonough participated twice as a guest lecturer "on the ... law for religious in the class on Introduction to Canon Law ... for the seminarians in the theology department." *Id.* at ¶ 33. She also "prepared a working translation and brief commentary for the canons on consecrated life as contained in the 1980 Schema of the Code of Canon Law ... [which] had been sent by Rome to ecclesiastical faculties of canon law (and various other persons and entities) throughout the world for study and comment." *Id.* at ¶ 34. Sister McDonough prepared a sixty-page spiral booklet, apparently on this subject, which "was widely used by students, canonists and religious for the next two or three years." *Id.* In addition, *Spirituality Today,* a journal then published by the Chicago Province of Dominican Fathers, published her article on "the relationship between spirituality and law in light of the soon to be promulgated revised Code."[5] *Id.* at ¶ 35. In February 1980, Sister McDonough was officially granted her JCB degree. *See id.* at ¶ 26. In the fall of that year her religious community approved her pursuit of a doctorate (JCD). *See id.* at ¶ 30.

While preparing to defend her doctoral thesis, Sister McDonough taught canon law at the Pontifical College Josephinum in Columbus, Ohio, along with part time tribunal (apparently adjudicative) work at the Diocese of Columbus. *Id.* at ¶ 36. In this capacity she received special permission from the Vatican "to function as Defender of the Bond in marriage cases submitted to the Tribunal." *Id.* at ¶ 37. Also during this period she was called upon by the Vicar for Religious in the Archdiocese of New York to participate in "collaborative consultation concerning matters of major import related to constitutional

3. The term "religious" will be used to refer to members of orders such as plaintiff's Dominican Order.

4. Canon Law is defined as:
   A body of Roman ecclesiastical jurisprudence compiled in the twelfth, thirteenth, and four-

teenth centuries form the opinions of the ancient Latin fathers, the decrees of General Councils, and the decretal epistles and bulls of the Holy See.
Black's Law Dictionary, 187 (5th ed. 1979).

5. 34 *Spirituality Today,* 233–34 (1982).

**4**

issues for the religious communities in that archdiocese." *Id.* at ¶ 38. During her time in Columbus, she began "to be called upon as a consultant for numerous communities of religious women." *Id.* at ¶ 39.

In May 1982, Catholic University awarded Sister McDonough a JCD, the fifth such degree to be awarded to a woman by Catholic University, which had awarded 504 such degrees during the preceding 100 years. *See id.* at ¶ 36.

According to Sister McDonough:

The Canon Law ("CL") Department at The Catholic University of American ("CUA"), *in addition to being a department* within the School of Religious Studies ("SRS"), is also an ecclesiastical faculty of canon law established by the Holy See. As such, it is the only educational entity in the United States *empowered by the Vatican* to confer degrees which are recognized by the Catholic Church as ecclesiastical degrees in church law. The degrees granted by the ecclesiastical faculty of canon law at CUA are the Licentiate in Canon Law (JCL) and the Doctorate in Canon Law (JCD).

*Id.* at ¶ 13 (emphasis added). The Department of Canon Law and the Department of Theology of the School of Religious Studies ("SRS"), and the School of Philosophy are the only purely ecclesiastical units at Catholic University. They are governed by Special Statutes for Pontifical Schools, one of which states that "[t]hese [s]chools are called Pontifical by virtue of accreditation by the Holy See; consequently those courses, programs, and degrees having canonical effects shall be conducted according to norms and regulations promulgated by the Holy See." Special Statute II (Def.Ex. 22).

Recent topics of dissertations for advanced degrees in Canon Law awarded by the University include:

"The Ministry of the Priest in the Exercise of the Munus Sanctificandi As It Pertains to the Eucharist" (1992);

"Episcopal Power of Governance in the Diocesan Church: From the 1917 Code of Canon Law to the Present" (1991);

"Obedience to the Bishop by the Diocesan Priest in the 1983 Code of Canon Law" (1990); and

"Faithful Fulfillment of the Pious Will: A Fundamental Principle of Church Law as Found in the 1983 Code of Canon Law" (1988).

Programs from the Catholic University Annual Commencements (attachment to Def.'s Jan. 14, 1994 Submission).

Between 1983 and 1993, the Canon Law Department awarded thirty-seven JCD degrees to twenty-six ordained persons, eight non-ordained members of religious orders, two Catholic lay persons and one lay person who is a former Catholic. JCL degrees were awarded to 279 persons, 235 of whom were ordained, thirty-four of whom were non-ordained members of religious orders, and ten of whom were Catholic laypersons.[6] Def.'s Jan. 14, 1994 Submission. Thus, over 95% of the students enrolled in the Canon Law Department have been ordained or members of a religious order. Before 1960, degrees of JCB, JCL and JCD were awarded only to males because, as a matter of practice, the study of canon law was limited to seminarians, and only males were eligible for "priestly ordination" and "officially deputed to exercise ordained ministry." Pl.'s Ex. 88 at ¶ 14. In the early 1960s, "some ecclesiastical faculties in Rome [began] to admit as students some religious brothers who were not seminarians, and some religious sisters, who—because of their sex—could not qualify to be seminarians." *Id.* at ¶ 15. In 1969, the first woman, a sister, earned a JCL degree from Catholic University. In 1975 two other sisters became the first women to win JCD degrees there.

**B.**

In November 1982, the Canon Law Department faculty at Catholic University invited Sister McDonough to apply for a teaching position there. She would be the first woman in the department. She consulted several people "about what might be [the] possibilities and pitfalls." *Id.* at ¶ 41. One man whom she consulted "raised questions about

6. The laypersons who have earned JCL degrees include former members of religious orders.

the faculty's readiness to add a woman to their company and how [she] would fit in." *Id.* With his "warnings in mind," she applied. *Id.* at ¶ 41. In May 1983, she was appointed "the *first woman* canon law faculty member with a tenure track appointment," probably the first "woman in any comparable position at any ecclesiastical faculty of canon law in the world as of 1983." *Id.* at ¶ 43 (emphasis in original).

By the time her first academic year was to begin at Catholic University, the Pontifical College Josephinum in Columbus had found no replacement for her. After consulting her major superior but, apparently, without advising her prospective employer (the Catholic University Canon Law Department) she "made arrangements to fly to Columbus on five weekends from September through mid-November to present classes on Friday evening and all day Saturday to cover the course on Basic Principles of Canon Law." *Id.* at ¶ 45.

Father Robert T. Kennedy, J.D., J.U.D., had just replaced Father John Lynch, as Chair of the Canon Law Department. When Sister McDonough arrived there and reported to Father Lynch, he referred her to Father Kennedy. According to Sister McDonough, when she "entered Dr. Kennedy's office he dispensed with any ordinary social amenities or professional welcome.... Dr. Kennedy had been informed by someone that I was still apparently in the permanent employee of Josephinum [and] accused [her] directly of unwillingness to offer ... best efforts on behalf of both CUA and the canon law department.... Dr. Kennedy said that these arrangements should have had his prior approval, as chair, as well as prior approval from the Dean of the School of Religious Studies and the Provost of the University." *Id.* at ¶ 47. It was Sister McDonough's "belief that Dr. Kennedy would not have treated [her] the way he did if [she] were a man." *Id.* at ¶ 48.

Despite this introduction, Sister McDonough worked very diligently as a member of the Canon Law faculty and published a number of articles before applying for tenure. In her first year Sister McDonough taught sev-

en classes including Religious Law, Ecclesiastical Latin, and Basic Principles of Canon Law. In later years, subjects taught by her included Consecrated Life and Sanctions. In January 1986, then-Department Chair Father Thomas Green recommended to Sister McDonough that she focus her research and writings on in-depth studies of religious law. *See* Pl.'s Ex. 14.

During the five years following her appointment to the faculty, Sister McDonough published a number of articles.[7] In 1983 she gave, and later published, a paper at a Boston College symposium on a "somewhat controversial Vatican document on religious life." Pl.'s Ex. 88 at ¶ 52. In 1984 she completed "a manuscript for a book on religious in the revised Code requested by the Franciscan Herald Press." *Id.* at ¶ 62; Pl.'s Ex. 81–k. In the summer of 1984 plaintiff wrote an article entitled "Religious Superiors and Government" at the request of a Jesuit publication. *See* Pl.'s Ex. 88 at ¶ 62. In 1985 Sister McDonough produced numerous papers, many of which were published. She was invited to present a seminar on "Religious Houses–Acquisition of Rights," which was subsequently published by the Canon Law Society of America. *See id.* at ¶ 65; Pl.'s Ex. 81–g. That same year she also was one of three major co-presenters at a workshop of the Society on "Religious Governance." *See* Pl.'s Ex. 88 at ¶ 67. In the summer of 1985, she wrote an article entitled "Women in the New Church Law," at the request of Concilium. *See id.;* Pl.'s Ex. 81–i. In September of 1985, she presented a paper entitled "Autonomy and Hierarchical Structure," at a Leadership Conference of Women Religious. *See* Pl.'s Ex. 88 at ¶ 67; Pl.'s Ex. 81–j. In 1986, plaintiff's article "Protection of Rights in Religious Institutes" was published in *The Jurist. See* Pl.'s Ex. 88 at ¶ 67; Pl.'s Ex. 81–b. She also prepared an article for a seminar on laity in the Church, which was published in *The Jurist* in 1987. *See* Pl.'s Ex. 88 at ¶¶ 68, 74; Pl.'s Ex. 81–e. In 1987, *Studia Canonica* accepted plaintiff's unsolicited article on sanctions. *See* Pl.'s Ex. 88 at ¶ 74; Pl.'s Ex. 81–d. In addition, Sister McDonough served as the book review editor

---

7. Plaintiff had also published as a student. *See*     *supra* p. 5.

for *The Jurist* and wrote numerous book reviews for that publication.

In addition to her scholarship, writing, and teaching, she was a "consultant for a special meeting [the] major superiors convened by the Leadership Conference for Women Religious ... in relation to the twenty-four women religious who had signed the ... full page ad in the *New York Times* entitled 'The Catholic Statement on Pluralism and Abortion.'" Pl.'s Ex. 88 at ¶ 65. She also "consulted for several communities of women religious including ... [hers]—whose members had signed the ad and who, consequently, were possibly subject to canonical penalties." *Id.* This consultation "eventually concluded in Rome ... at a meeting with Cardinal Hamer, then head of the Vatican Congregation for Religious and Secular Institutes." *Id.* In March 1988, she was "canonical consultant for two major contentious cases which had been referred to the Vatican, one concerning rights of religious in the restructuring of the corporate membership of Duquesne University and the other concerning the status of a Trappist monk, Brother Leo, who was well-known from the Sarita Kennedy East Foundation case in the Diocese of Corpus Christi, TX." *Id.* at ¶ 77. She also "consulted extensively in regard to the case of the 'barricaded' Carmelite Nuns," and chaired a three person committee addressing the formation of "one single religious community from ... 25 smaller communities...." *Id.* at ¶ 87.

In 1988, the Canon Law Department promoted Sister McDonough to associate professor, and she began meeting with the Department Chair, Father Provost, about his understanding of tenure procedures. At one such meeting Father Provost volunteered that Father Kennedy had "opposed [her] promotion" without offering any reasons. *Id.* at ¶ 83. At a subsequent meeting about tenure, Dean Cenkner told her that her publications were "marginal" and that she should "write two 50 or 60 page scholarly articles to include in her tenure application," one of which was submitted with her original application, and the other submitted later with a renewed application. *Id.* at ¶ 85.

The criteria for tenure at the University are set out in the Faculty Handbook. *See* Def.'s Ex. 21. The handbook requires that the faculty reviewers deny tenure if there is "reasonable doubt" that the application has satisfied the handbook criteria. *See id.* at 8. Selection for tenure in any one of the three ecclesiastical faculties at the University, requires an affirmative recommendation of a majority of tenured faculty in the applicant's department and a majority, in this case, of the SRS Committee on Appointments and Promotions (CAP), and the CAP of the Academic Senate (drawn from all University faculty). In addition, a tenured appointee in the Canon Law Department (as well as the other ecclesiastical faculties) is required to have a canonical mission or mandate from the Archbishop of Washington, acting as Chancellor of the University. Furthermore, the bishops on the Board of Trustees, after consultation with the Apostolic See, would have been required to "review the application and, by corporate decision, make a declaration to the Chancellor that there is no impediment to the appointment." Def.'s Ex. 23 at ¶ 44; *see also* Testimony of Father Provost, Transcript of Trial ("Tr."), Vol. IV (Nov. 8, 1993), at 43–44.[8]

Sister McDonough submitted her tenure application in August 1988. In September she began to receive discouraging bits of information from various participants, such as a request for a student recommendation and for written evidence of consultations mentioned in her application. One supportive faculty member reported that "[t]hey are discussing every little thing" which was "ordinary procedure for *THIS* case." Pl.'s Ex. 88, at ¶ 91 (capitals and emphasis in original). In fact, in September and early October, the Canon Law faculty held three meetings about Sister McDonough's original application for tenure. *See* Def.'s Exhibit 17. The minutes of those meetings recorded comments in favor and not in favor of the candidate. For example, a then recent article was viewed favorably as "a serious discussion of a controverted issue in canon law," published in the *Antonianum*, her teaching competence had steadily improved, and she had been

---

8. At this stage, the application can be sent to the Vatican for comment.

available to students. On the other hand, it was commented, her "other writings to date are mediocre." Also, "[e]arly on, there was a problem with a 'high school marm' approach. Student evaluations have not been very strong [possibly] ... because of her personal high standards; but this also seems to stem from a high-school approach to assignments, testing and grading...." *Id.* at 1. On October 5, Father Provost advised Sister McDonough that the tenured faculty had voted the day before by a "split negative" not to recommend her for tenure. Pl.'s Ex. 88 at ¶ 92. The vote was two in favor, three against, and one abstaining.

Thereafter, Sister McDonough, rejecting one suggestion that she withdraw her application and another suggestion that she refer her case to the University's affirmative action officer, appealed the faculty decision to the School of Religious Studies Committee. It deferred consideration of the application and referred it back to the Canon Law Department for reconsideration in light of the second of the two articles that Sister McDonough had prepared and published in response to Father Provost's recommendation. *See* Pl.'s Ex. 26. After reviewing her resubmitted application on November 15, 1988, the faculty again failed to recommend tenure; the vote was three in favor and three against.

After the Department failed to recommend tenure for Sister McDonough in October 1988, she told one of the Fathers sitting on the School of Religious Studies Committee that she was considering bringing her case to the attention of the University Affirmative Action Officer. According to Sister McDonough, the Father responded that she would be labelled as a troublemaker and would be terminated. In any event, she did not approach the Affirmative Action Officer. *Compare* Pl.'s Ex. 88 at ¶ 47 *with* Testimony of Father Bernard Marthaler, Tr., Vol. IV (Nov. 8, 1993) at 137–140, 163–166.

9. In her affidavit plaintiff states,
   While in Ohio my major superior also directed me to retain an attorney in the Washington area, to familiarize this attorney with the case, and to keep counsel apprised of developments, all of which I did. This attorney was retained until early February 1990 at the expense of $9,433.08. My current counsel, Bonnie Y. Hochman who is currently affiliated with

On November 28, 1988, after consulting with her major superior in Ohio and some of the Canon Law faculty, she withdrew her application with a view to submitting a reformulated one. At about this time, at the direction of the major superior in Columbus, she hired an attorney in the Washington area whose fees were to be paid by her Dominican order.[9]

In January 1989, Sister McDonough submitted a revised application to the Canon Law faculty; on February 16, 1989, the faculty voted once again not to recommend tenure—the vote was three in favor to three against. This time, however, her appeal to the School of Religious Studies Committee produced a vote of three to two in favor of tenure. Accordingly, the application, so recommended by that Committee, together with a letter of recommendation from the Dean of the School, proceeded to the Faculty Senate Committee on Appointments and Promotions.

Prior to the vote of the Senate Committee, Monsignor McManus had sent a letter criticizing Sister McDonough's advice to an unnamed student and criticizing her complaints regarding possible gender discrimination in the review of her application. Pursuant to the Monsignor's request, this letter was made available to all the Senate Committee members. *See* Pl.'s Ex. 32.

On March 14, 1989, the Senate Committee voted on Sister McDonough's application: three in favor, one against, with two abstentions. A positive recommendation requires that a majority of the votes cast be favorable, thus the vote on Sister McDonough's application was considered a negative recommendation.

On April 3, 1989, plaintiff was notified of the Senate Committee's negative vote. By a letter dated April 4, 1989, Sister McDonough

   Krooth & Altman, has been retained since January 1993. Her legal fees and costs well exceed $30,000.
   Pl.'s Ex. 88 at ¶ 100 (citation to exhibits omitted).
   It can be inferred from this declaration and from plaintiff's vow of poverty that her Order has paid her legal fees.

requested an appeal. On April 5, 1989, the Academic Vice President of Catholic University granted Sister McDonough's appeal and advised the Senate Committee that the record raised "substantive and procedural questions." Pl.'s Ex. 42.

While her appeal was pending, plaintiff submitted copies of her then new article published in *The Jurist;* she also suggested external evaluations. The new Senate Committee chairman, Dr. Nemoianu, represented that he would contact the reference provided by plaintiff. In addition, the University contacted two external evaluators not acquainted with plaintiff. The external evaluators concluded that her publications were of high scholarly quality and recommended that she receive tenure. *See* Pl.'s Exs. 50–51; *see also* Pl.'s Ex. 54.

While Sister McDonough's appeal was pending, she wrote two of the members of the Senate Committee and expressed her belief that she was being held to a higher standard because of her gender. *See* Pl.'s Exs. 46 and 47.

Sister McDonough's application was made available to the members of the Senate Committee approximately two weeks before its November 14, 1989 meeting. During that time Father Nemoianu and, it may be inferred, the other six members of the Committee, "spent a considerable amount of time reviewing the unusually long, detailed application and reading the candidate's publications which were a part of that file." Affidavit of Virgil P. Nemoianu at 6. On November 14, the Committee discussed the matter for about 45 minutes and then voted unanimously not to recommend to the ultimate authority tenure for Sister McDonough. One of Sister McDonough's three supporters in April of 1989 was no longer serving on the Senate Committee, and two had changed their views. The stated reasons for the negative recommendation were:

1. The scholarship of the candidate does not measure up to the standards expected in the field for the granting of tenure;
2. While the committee recognized the candidate's contribution to service and the practice of canon law, in its opinion this factor does not counterbalance the marginal performance in teaching and scholarly publications;
3. Considering the split vote of the departmental faculty and the Committee on Appointments and Promotions of the School of Religious Studies, the committee could not 'be assured beyond reasonable doubt that the candidate under review possesses … the optimal qualifications for the position' and therefore is constrained to 'recommend against the granting of tenure' (*Faculty Manual*, p. 8).

Memo from Professor Virgil Nemoianu to Father John Wippel, Academic Vice President, dated November 15, 1989 (Def.'s Ex. 38). Sister McDonough's appointment as an Associate Professor expired by its terms on August 31, 1990.

Even if the faculty, the School of Religious Studies Committee, and the Faculty Senate Committee had approved tenure for Sister McDonough, the decision would have required the approval of the Archbishop of Washington and the episcopal members of the University Board of Trustees, acting for the Apostolic See. Testimony of Father Provost, Tr., Vol. IV (Nov. 8, 1993) at 43–44. Action on plaintiff's discrimination claim would require the Court to anticipate and, in effect, preempt the decision-making authority of the Vatican, which is ultimately responsible for selecting tenured professors in the Catholic University School of Religious Studies, including the Department of Canon Law. It may be reasonably inferred that the decision-making process so superseded would have included examination of how the processor-applicant's teachings (and writings) compared with the Apostolic Constitution and Pope John Paul II's Code of Canon Law. *See* Def.'s Proposed Findings of Fact and Conclusions of Law at 40; Def.'s Ex. 23.

Sister McDonough's case relied in large part on comparative evidence, all of which can be found in the record. Briefly stated, her application for tenure was compared to the two most recent successful applications for tenure: Father Provost in 1984 and Father Kennedy in 1981. Plaintiff has published much more extensively than Father Kennedy had at the time of his application.

*Compare* Pl.'s Ex. 54 *with* Pl.'s Ex. 59; *see also* Pl.'s Ex. 81–a–i. Plaintiff offered expert testimony that her articles were of high scholarly quality. *See* Testimony of Father Hill, Tr., Vol. II (Nov. 4, 1993) ·at 4–37. Plaintiff also offered evidence that her teaching evaluations were comparable, if not better than her tenured colleagues. *See, e.g.,* Pl.'s Exs. 58 & 60.

However, the comparison between the quantity of plaintiffs publications and those of Father Provost does not favor plaintiff. *Compare* Pl.'s Ex. 54 *with* Pl.'s Ex. 60. There is also evidence that Father Kennedy's classroom teaching was very highly regarded, and he offered a unique dual-expertise in civil and canon law, having received a J.D. from Harvard Law School. *See* Pl.'s Ex. 59; Test. of Fr. Green, Tr., Vol. II (Nov. 4, 1993) at 62–64. Moreover, Father Kennedy's award of tenure was given at an earlier time when the department's enrollment was predicted to increase because of recent revision of the code.

It is possible for a court to compare the quantity of published articles and, to some extent, the teaching evaluations. The issue decided by the Canon Law Department, the School of Religious Studies, the Faculty Senate and, ultimately, the Church authorities, necessarily involves the quality, and hence the substance, of her work. That substance is materially religious. In reviewing actions on most complex and technical subjects, a trier of fact chooses between competing expert opinions. There are such competing expert opinions as to the quality and, necessarily, the religious substance of Sister McDonough's writings in this record. I find and conclude that it is neither reasonably possible nor legally permissible for a lay trier of fact to evaluate these competing opinions on religious subjects.

## II.

### A.

The First Amendment commands Congress to "make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Section 702 of Title VII narrowly exempts "a religious corporation, association, educational institution, or society with respect to the employment of individuals *of a particular religion* to perform work connected with ·the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e–2 (1988). The facts here require the conclusion that the Canon Law Department of the School of Religious Studies of the Catholic University of America is a "religious ... educational institution." [10] However the exemption does not apply to this case as it is obvious that Sister McDonough was not denied tenure because of her Catholic faith. Accordingly, it becomes necessary to confront the constitutional issue of whether Title VII as applied by the EEOC and as it would be applied by federal courts, to the facts and relationships here would violate the First Amendment. *See, e.g., International Association of Machinists v. Street,* 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1789–90, 6 L.Ed.2d 1141 (1961). The facts and relationships here require the conclusion that application of Title VII to them would violate both the Free Exercise and the Establishment Clauses by entangling government in a primarily religious function and relationship.

### B.

The Supreme Court has held that the Free Exercise Clause provides religious institutions with the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952). It precludes civil interference "with ecclesiastical hierarchies, church administration, and appointment of clergy." *King's Garden, Inc. v. Federal Communications Commission,* 498 F.2d 51, 56 (D.C.Cir.1974). Many hiring decisions within a religious institution determine "whose voice speaks for the church," and there is no "area of inquiry less suited to a

---

**10.** The sometimes secular aspect of the University does not secularize plaintiff's role, the Canon Law Department, or its relationship between them.

**10**

temporal court for decision." *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1356–57 (D.C.Cir.1990). Courts have developed a "ministerial function" test to determine whether a discrimination claim brought by an employee of a church or religious institution can be reviewed by a civil court. An employee whose " 'primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship' " must look elsewhere than to government agencies and courts for relief from race, sex, national origin, or age discrimination. *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986) *quoting* Bagni, "Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations." 79 *Colum.Law Rev.* 1514, 1545 (1979).

### 1.

■ As stated, the facts here demonstrate that the Canon Law Department of the School of Religious Studies within the Catholic University of America is a religious institution. In a similar context, the Fifth Circuit held that a Baptist Seminary was a religious institution for purposes of a "ministerial functions" inquiry. *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 279 (5th Cir.1981). The *Southwestern Baptist* court relied on the fact that the seminary was owned and operated by an association of Baptist churches which provides sixty percent of its financial support. *Id.* That court also found that the seminary's curriculum was sectarian, offering degrees in theology, religious education, and church music. Moreover, the seminary trained future ministers and thus required representation that students received "the call" to ministry. *Id.*

There is no material difference between the Canon Law Department at Catholic University and a department within a seminary.

The Vatican retains the ultimate authority over the Canon Law Department as a unit of the School of Religious Studies. Catholic University is a Vatican-chartered University. The Canon Law Department has a special status within Catholic University as one of its three "ecclesiastical departments." The Vatican must grant final approval to all tenured faculty of the Canon Law Department. Moreover, the Canon Law Department students are almost exclusively priests and members of religious orders—all of whom received a call to serve their church. Like a seminary, the subject matter is predominantly ecclesiastical. The dissertation subjects of the Canon Law Department students dramatically evidence its religious focus. The Department's purpose, in substantial part, is to train future church leaders in the law that governs the Catholic Church and the religious life of its members. The sectarian origin and character of Canon Law are further evidenced by the consistent refusal of federal and state courts to resolve disputes rooted in Canon Law. As the Supreme Court said in a related context, the First Amendment requires that civil courts defer to ecclesiastical tribunals regarding questions of "canon or ecclesiastical law." *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976).[11]

### 2.

Sister McDonough's primary role in the Department of Canon Law was the functional equivalent of the task of a minister, as that set of duties is broadly defined in the case law. *See, e.g., Rayburn,* 772 F.2d at 1168–69. She instructed or "spread" religious doctrine as embodied in the Canon Law. Sister McDonough's functions as a professor of canon law included "teaching ... church governance" and other essentially religious subject matter. *See id.* at 1169. She taught such courses as Religious Law and Consecrated Life. Her writings included articles on the rules governing members of religious orders

---

**11.** The Court of Appeals in this Circuit recently cited *Serbian Eastern Orthodox Diocese* for the proposition that "courts may not consider provisions whose enforcement would require 'a searching and therefore impermissible inquiry' into church doctrine." *Minker v. Baltimore Annual Conference,* 894 F.2d 1354, 1360 (quoting *Serbian Eastern Orthodox Diocese,* 426 U.S. at 723, 96 S.Ct. at 2387).

and interpretations of the canons. *See, supra* p. 10. Just as the Constitution, statutes and decided cases are instruments for "governance" of the United States, so the Canon Law is an instrument for "governance" of the Catholic Church. Moreover, Canon Law provides guidance for the members of the Catholic Church. As such, Canon Law is church doctrine. For example the Canon Law has been cited by civil courts as expressing Church doctrine as to when human life begins. *See, e.g., Roe v. Wade*, 410 U.S. 113, 133–34 & n. 22, 93 S.Ct. 705, 716–17 n. 22, 35 L.Ed.2d 147 (1973) (citing Means I, at 411–12); Noonan 20–26; Quay 426–30; J. Noonan, *Contraception: A History of Its Treatment by the Catholic Theologians and Canonists* 18–29 (1965).[12]

The evidence requires the conclusion that the mission of the Canon Law Department, and Sister McDonough's role as a teacher, scholar, writer, and part-time consultant and as a committed member of the Dominican Order are separately and in concert, "important to the spiritual and pastoral mission of the church." *See Rayburn*, 772 F.2d at 1169. It may be that no one of these roles "so embodies the basic purpose of the religious institution that state scrutiny of the process for filling the position would raise constitutional problems; [but] when functions are combined, the burden of potential interference becomes extraordinary." *See id.* at 1168. Therefore, the Free Exercise Clause precludes review of this employment decision.

■ Plaintiff points to the fact that she is not ordained and argues that the Free Exercise Clause should only preclude review of Title VII in cases brought by ordained ministers or priests. However, the mere fact of ordination is not determinative. Rather, it is the role or function of the employee that is critical. Courts have made clear that the First Amendment preempts Title VII claims brought by non-ordained persons performing religious functions. *See, e.g., EEOC v. Southwestern Baptist*, 651 F.2d at 279, 283; *Rayburn*, 772 F.2d at 1165, 1169. The unsuccessful plaintiff in *Southwestern Baptist* was a theology professor in a Baptist seminary. The plaintiff in *Rayburn* was a woman "associate in pastoral care," who was not ordained and whose duties included teaching. *See* 772 F.2d at 1165.

## C.

■ The Establishment Clause prohibits the government from "involv[ing] itself too deeply in [a religious] institution's affairs," *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 591, 109 S.Ct. 3086, 3099–100, 106 L.Ed.2d 472 (1989); or having " 'an excessive government entanglement with religion.' " *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (quoting *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). The determination of whether there is excessive entanglement turns on the character and purpose of the institution involved, the nature of the regulator's intrusion into church affairs, and the resulting relationship between the government and the religious authority. *See Lemon*, 403 U.S. at 615, 91 S.Ct. at 2112.

### 1.

■ The evidence supporting the Free Exercise Clause analysis is also determinative of the Establishment Clause issue. In 1990, the Court of Appeals for this Circuit, in a related context, declared that "any inquiry into the Church's reasons for asserting that [plaintiff] was not suited for a particular pastorship would constitute an excessive entanglement in its affairs." *See Minker*, 894 F.2d at 1360.[13] Plaintiff here presents one of those cases "in which the relationship between employee and employer is so perva-

---

12. Canon law also determines which marriages and annulments are recognized by the Church. *See, e.g., Little v. Wuerl*, 929 F.2d 944, 946 (3d Cir.1991).

13. The *Minker* Court cited a First Circuit case holding that an "inquiry … into the circumstances of [plaintiff's] discharge plunges an inquisitor into a maelstrom of Church policy, administration, and governance." *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir.1989) (*quoted in Minker*, 894 F.2d at 1360).

sively religious that it is impossible to engage in [a] ... discrimination inquiry without serious risk of offending the Establishment Clause." *DeMarco v. Holy Cross High School,* 4 F.3d 166, 172 (2d Cir.1993). A judicial evaluation of the "quality" of Sister McDonough's canon law scholarship would constitute and the prolonged monitoring and investigation by the EEOC has constituted excessive entanglement with religion in violation of the Establishment Clause.

During the trial in this federal court, the critical issue of pretext generated contradictory opinion testimony about the "scholarly" quality, as distinguished from quantity, of Sister McDonough's writing as well as her teaching of canon law and other related, and primarily religious, subjects. Fourteen out of eighteen witnesses called, sworn and vigorously cross-examined, were clergy or members of a religious order. The differences in opinion were among the clerical members of the faculty, as well as between them and outside evaluators. Plaintiff argues that the clergymen who reviewed and ruled on the pedagogical quality of Sister McDonough's teaching of courses, such as Consecrated Life, and the scholarly quality of her writing could, and did, evaluate her without making doctrinal religious judgments, and that a court could and should independently determine the *bona fide* of these evaluations. But no expert testimony can effectively filter out the religious elements from the secular ones sufficiently to avoid unwholesome and impermissible entanglement with religious concerns.

The general subject matter of her scholarship, canon law, not only governs the Church and its members, it is essentially ecclesiastical doctrine. Plaintiff's expertise lies in laws governing religious orders and, in particular, women religious. Plaintiff herself brought to the Department the perspective of a sister and member of a religious order. Some of her articles were written, at least in part, for members of religious orders who do not hold degrees in canon law. These articles were not deemed scholarly by some of the faculty who testified. *See, e.g.,* Def.'s Ex. 50 at 9 (Decl. of Fr. McManus). This suggests a disagreement about the "scholarliness" and the importance of canon law articles written for practitioners, including women religious. Civil courts should not be entangled in such disputes.

2.

■ Entanglement also has already resulted from the interaction between a government agency, the EEOC, and Catholic University's Department of Canon Law. In this action, the EEOC's investigation lasted more than two years and presumably was sufficiently thorough to have inquired deeply into the issues that were later tried here. The First Amendment precludes sustained involvement that "would result in an intolerably close relationship between church and state both on a substantive and procedural level." *Rayburn,* 772 F.2d at 1170. The Department of Canon Law is not immune from all temporal claims filed against it. However, "pervasive monitoring by public authorities ... infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement." *Aguilar v. Felton,* 473 U.S. 402, 413, 105 S.Ct. 3232, 3238, 87 L.Ed.2d 290 (1985). If this plaintiff can involve the EEOC and the Court in the tenure decision at issue here, the prospect that others will follow portends impermissible "pervasive monitoring" of religious-freighted decisions of an essentially religious body. *Id.* As Judge Wilkinson noted, "[t]here is the danger that [religious institutions], wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own ... doctrinal assessments." *Rayburn,* 772 F.2d at 1171.

III.

Thus, the facts compel the following conclusions. The Canon Law Department of the School of Religious Studies of Catholic University of America is a religious institution. Sister McDonough, as a professor in the Canon Law Department who taught the Church's governing law predominantly to priests and members of religious orders, was, and as a tenured professor would have been, one whose "primary duties consist of teaching, spreading the faith [and] church gover-

nance." *Rayburn*, 772 F.2d at 1169. A comparative review of the quality of plaintiff's scholarship and teaching, the monitoring of and investigation into the tenure decisions of the Canon Law Department by the EEOC and the courts, and the possible judicial involvement in a larger doctrinal intra-church controversy,[14] has impermissibly entangled the civil authorities in religious decision-making, and would do so in the future. This would impair a religious institution's choice of those who teach its doctrine and participate in church governance. Therefore, the religion clauses of the First Amendment preclude decision of this Title VII action on its merits.

14. The possibility of intra-church controversy is suggested by the testimony on the importance of scholarship aimed at practitioners, including women religious, and the scholarly quality of such works. Also, it may or may not be relevant in this context that Sister McDonough hired an attorney at the direction of her Order and that the Order has subsidized her attorneys' fees. *See* p. 15 n. 9.