EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION and Elizabeth
McDonough, Appellants,

v.

The CATHOLIC UNIVERSITY
OF AMERICA, Appellee.

Nos. 94–5263, 94–5283.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 15, 1995.

Decided May 14, 1996.

Samuel A. Marcosson, Equal Employment Opportunity Commission, Uniondale, NY, argued the cause and filed the briefs, for appellant Equal Employment Opportunity Commission.

Bonnie Y. Hochman, argued the cause and filed the briefs, for appellant Elizabeth McDonough.

James B. Sarsfield, Washington, DC, argued the cause, with whom George T. Masson, Jr., was on the brief, for appellee.

Before BUCKLEY, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge HENDERSON.

BUCKLEY, Circuit Judge:

Sister Elizabeth McDonough and the Equal Employment Opportunity Commission allege that The Catholic University of America engaged in sex discrimination and retaliatory conduct, in violation of Title VII of the Civil Rights Act of 1964, when it denied her application for tenure in its Department of Canon Law. District Judge Louis F. Oberdorfer dismissed the action as precluded by the First Amendment's religion clauses. We agree with Judge Oberdorfer that the Free Exercise Clause forbids judicial review of this case because Sister McDonough's role at Catholic University was "the functional equivalent of a minister." We also agree that the application of Title VII to her employment requires an intrusion by the Federal Government in religious affairs that is forbidden by the Establishment Clause.

## I. BACKGROUND

### A. The Canon Law Department of The Catholic University of America

The Catholic University of America was chartered by Pope Leo XIII in 1887 as a Roman Catholic institution of higher learning. C. Joseph Nuesse, *The Catholic University of America: A Centennial History* 52–53 (1990). Originally, the University was "strictly a pontifical institution, functioning under the direction of the Holy See." *Granfield v. Catholic University of America,* 530 F.2d 1035, 1043 n. 19 (D.C.Cir.1976). Although the University's by-laws were amended in 1970, giving it greater independence from the Vatican, it remains a "sectarian institution" that is governed by a Board of Trustees consisting of fifteen members of the American Catholic hierarchy (usually bishops) and fifteen laymen. *See id.* The University's Departments of Canon Law and Theology (which are departments within its School of Religious Studies) and its School of Philosophy, however, remain under pontifical direction and hold the canonical status of "ecclesiastical faculties." *See Canonical Statutes of the Ecclesiastical Faculties of the Catholic University of America ("Canonical Statutes"),* Part I, Sec. 1.

This case concerns the University's Department of Canon Law ("Department"). Canon law is the "fundamental body of ecclesiastical laws" of the Roman Catholic Church. Canon Law Society of America, *Code of Canon Law* xvi (1983). It governs the sacramental life of the Church and defines the obligations and rights of the faithful. *Id.,* Books II and IV. The Department's stated purpose is "to familiarize the student with the entire body of ecclesiastical law, its development and interpretation," *Statutes of the Ecclesiastical Faculty of Canon Law,* Part I; it is the only institution in the United States that is empowered by the Vatican to confer ecclesiastical degrees in church law. Affidavit of Sister Elizabeth McDonough ("McDonough Affidavit") at ¶ 13, *reprinted in* Joint Appendix ("J.A.") 328.

### B. Sister Elizabeth McDonough

Sister Elizabeth McDonough is a nun in the Dominican Order. Following her profession of vows, Sister McDonough was assigned to teach mathematics, science, and religion at Catholic high schools in Connecticut and Ohio. In January 1976, her superior suggested that she pursue a degree in canon law, a field of study that the Catholic Church

had recently opened to women. Accordingly, in the fall of 1978, Sister McDonough enrolled in the School of Religious Studies at Catholic University. In 1979, she transferred to the school's Department of Canon Law and, in May 1982, became the fifth woman at Catholic University to receive a Doctorate of Canon Law.

Soon after receiving her degree, Sister McDonough applied for a teaching position in the Department. Her application was accepted and, in 1983, she became the first woman to be admitted to its faculty with a tenure track appointment. In addition to teaching classes, Sister McDonough assisted students, published articles, and performed various consulting services. In 1988, she was promoted to the rank of associate professor and began inquiring into her prospects for securing tenure.

### C. Tenure Application within the Department of Canon Law

In order to secure tenure in the Department of Canon Law, an applicant's qualifications must first be reviewed by three academic bodies: the tenured faculty members within the Department, the School of Religious Studies' Committee on Appointments and Promotions ("School CAP"), and the Academic Senate's Committee on Appointments and Promotions ("Senate CAP"). A favorable recommendation by any of these bodies requires the vote of a majority of those participating in the consideration of a case. The procedures governing these reviews are set forth in the University's Faculty Handbook and are generally applicable to all candidates for tenured positions at the University. Because the Department of Canon Law is an ecclesiastical faculty, however, an applicant for tenure in the Department who has survived the review of his academic peers must also be approved by ecclesiastical authorities in accordance with the procedures set forth in the University's Canonical Statutes. Affidavit of Father James H. Provost ("Provost Affidavit") at 6, *reprinted in* J.A. 478. These provide that, after the candidate has received the affirmative recommendation of the Senate CAP, the President of the University must forward to the Chancellor, who is, *ex officio*, the Archbishop of Washington, the application and all relevant information regarding the appropriateness of the candidate's appointment to an ecclesiastical faculty. *Canonical Statutes,* Part III, Sec. 6, Part V, Sec. 3. It is the Chancellor who "grants the canonical mission to teach in the name of the Church." *Id.,* Part V, Sec. 4.

The Canonical Statutes provide, further, that before the Chancellor may appoint a person to a tenured professorship, the members of the Board of Trustees who are bishops must review the application and, after consultation with the Vatican, make "a declaration to the Chancellor that there is no impediment to the appointment." *Id.,* Part V, Sec. 6.1 & n. 3 (noting "existence of an agreement between the Chancellor and the Apostolic See regarding consultation of the Apostolic See prior to the making of this declaration by the episcopal members of the Board"). In the case of one of the Department's tenured professors, the process of consultation extended over a period of seventeen months, in which he responded in writing to questions presented by the Vatican through the Archbishop of Washington and met with several groups of bishops, cardinals, and other church officials both in the United States and in Rome. Provost Affidavit at 7, J.A. 479.

Sister McDonough submitted her initial tenure application in August 1988. On October 4, 1988, the Canon Law Faculty voted not to recommend tenure by a "split negative vote" of two in favor, three against, and one abstention. She appealed this decision to the School CAP which, without voting, returned her application to the Department for reconsideration in light of a new article she had published. On November 15, 1988, the Canon Law Faculty held a second vote and again failed to muster the majority required to endorse her application. After consulting with members of her religious congregation, Sister McDonough withdrew her application.

Sister McDonough submitted a revised application the following January; and, for the third time, the Canon Law Faculty withheld an affirmative recommendation by a vote of three to three. She again appealed to the School CAP, which this time voted in favor of

tenure and forwarded her application to the next level of review, the Senate CAP. This body denied Sister McDonough the absolute majority required for a recommendation by a vote of three in favor, one against, and two abstentions.

Sister McDonough appealed the Senate CAP's decision, alleging that she had received "differential and unfair treatment." McDonough Affidavit at ¶ 107, J.A. 375. The University's Academic Vice President granted her appeal and returned the application to the Senate CAP for reconsideration, citing "substantive and procedural questions." During the interval between the Senate CAP's initial vote and its reconsideration of her application, Sister McDonough submitted copies of a new article that she had published; and the University asked certain external evaluators to comment on her scholarship. Sister McDonough also wrote letters to two members of the Senate CAP expressing her belief that she was being held to a higher standard because of her sex. On November 14, 1989, after reviewing the new publication and despite the favorable tenor of the external evaluations, the Senate CAP voted unanimously not to recommend tenure. The reasons given for the denial were:

1. The scholarship of the candidate does not measure up to the standards expected in the field for the granting of tenure;
2. While the committee recognized the candidate's contribution to service and the practice of canon law, in its opinion this factor does not counterbalance the marginal performance in teaching and scholarly publications;
3. Considering the split vote of the departmental faculty and the Committee on Appointments and Promotions of the School of Religious Studies, the committee could not "be assured beyond reasonable doubt that the candidate under review possesses ... the optimal qualifications for the position" and therefore is constrained to "recommend against the granting of tenure" (*Faculty Manual,* p. 8).

*EEOC v. Catholic University of America,* 856 F.Supp. 1, 8 (D.D.C.1994) (*"Catholic University"*) (quoting memorandum dated Nov. 15, 1989, from Professor Virgil Nem-

oianu to Academic Vice President John Wippel). Sister McDonough's employment as an associate professor with the Department of Canon Law expired on August 31, 1990.

### D. The EEOC and the District Court Proceedings

Sister McDonough filed discrimination charges against Catholic University with the Equal Employment Opportunity Commission on January 18, 1990. After a two-year investigation and failed efforts at conciliation, the EEOC joined Sister McDonough in instituting this action in which they allege that, in denying Sister McDonough's application for tenure, Catholic University engaged in sex discrimination and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

The case went to trial on November 3, 1993, and was concluded one week later. What emerged as the critical factual issue was whether the University's stated reasons for denying tenure, namely, Sister McDonough's "marginal performance in teaching and scholarly publications," were pretextual. In order to establish that they were, Sister McDonough introduced testimony comparing her performance with that of the two most recent applicants to be granted tenure in the Department of Canon Law, both of whom were men. This comparison largely focused on the quantity of her publications and the quality of her scholarship as reflected in them.

During the presentation of evidence, Judge Oberdorfer expressed his uneasiness at "sitting on the qualifications of an expert in canon law" and suggested that the line of inquiry was "getting awful[ly] close to entangling the government and the judiciary in religious matters." Nov. 4, 1993 Trial Transcript at 9–10, J.A. 199. *See also* Nov. 5, 1993 Trial Transcript at 147, J.A. 240 ("I've got to pass on people's judgment about colleagues in a religious setting ... and when I hear this ... aggressive examination of a priest about what is at least partly his clerical duties, I've got a problem."). Shortly thereafter, he asked the parties to submit briefs on whether he had the constitutional authority to hear the case.

After reviewing the parties' submissions and hearing oral argument, Judge Oberdorfer dismissed the case without reaching the merits. He concluded that the "application of Title VII to [the facts and relationships] would violate both the Free Exercise and the Establishment Clauses...." *Catholic University,* 856 F.Supp. at 9. Specifically, he found that "Sister McDonough's primary role in the Department of Canon Law was the functional equivalent of the task of a minister," *id.* at 10, and concluded that "the Free Exercise Clause precludes review of this employment decision." *Id.* at 11. He also held that the Establishment Clause barred adjudication of Sister McDonough's claims on the ground that "[a] judicial evaluation of the 'quality' of [her] canon law scholarship would constitute[,] and the prolonged monitoring and investigation by the EEOC has constituted[,] excessive entanglement with religion...." *Id.* at 12.

In their appeal from the district court's order, appellants make a number of arguments, of which the following warrant analysis: (1) the "ministerial exception" relied on by the district court has been discredited by the Supreme Court's decision in *Employment Division, Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); (2) even if the exception remains valid, it does not apply to the facts of this case; and (3) because the district court was not required to address any religious issues, the case could not have posed a risk of "undue governmental entanglement" with religion in violation of the Establishment Clause.

## II. ANALYSIS

This case presents a collision between two interests of the highest order: the Government's interest in eradicating discrimination in employment and the constitutional right of a church to manage its own affairs free from governmental interference. As in many cases dealing with the autonomy of religious bodies, this one requires analysis under both the Free Exercise and Establishment Clauses of the First Amendment. We address each in turn.

### A. The Free Exercise Clause

■ The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I. The limits placed by the First Amendment on the Government extend to its judicial as well as legislative branch. *See Kreshik v. Saint Nicholas Cathedral of the Russian Orthodox Church of North America,* 363 U.S. 190, 191, 80 S.Ct. 1037, 1038, 4 L.Ed.2d 1140 (1960).

The Supreme Court has recognized that government action may burden the free exercise of religion, in violation of the First Amendment, in two quite different ways: by interfering with a believer's ability to observe the commands or practices of his faith, *see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531–33, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993) ("the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons"), and by encroaching on the ability of a church to manage its internal affairs. *See, e.g., Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 116, 73 S.Ct. 143, 154–55, 97 L.Ed. 120 (1952) (Free Exercise Clause protects power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine").

The Supreme Court has shown a particular reluctance to interfere with a church's selection of its own clergy. *See, e.g., Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16, 50 S.Ct. 5, 7–8, 74 L.Ed. 131 (1929) ("it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them"); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 717, 96 S.Ct. 2372, 2384, 49 L.Ed.2d 151 (1976) ("questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern").

### 1. The Ministerial Exception

Relying on these and other cases, this circuit and a number of others have long held that the Free Exercise Clause exempts the selection of clergy from Title VII and similar statutes and, as a consequence, precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them. *See, e.g., Minker v. Baltimore Annual Conference of the United Methodist Church,* 894 F.2d 1354, 1358 (D.C.Cir.1990) (adjudication of minister's Age Discrimination in Employment Act claim against his church would violate the Free Exercise Clause); *McClure v. Salvation Army,* 460 F.2d 553, 558, 560 (5th Cir.1972) (recognizing that "[t]he relationship between an organized church and its ministers is its lifeblood" and that application of Title VII to this relationship would encroach on religious freedom); *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994) (Free Exercise Clause bars Title VII action by probationary minister against her church); *Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360 (8th Cir.1991) (religion clauses bar application of Title VII and Age Discrimination in Employment Act claims of chaplain against church-affiliated hospital); *Natal v. Christian and Missionary Alliance,* 878 F.2d 1575 (1st Cir. 1989) (Free Exercise Clause bars wrongful termination action brought by clergyman against not-for-profit religious corporation). We have noted that in excepting the employment of a minister from Title VII, "[w]e need not find that the factors relied upon by [a] Church [are] independently ecclesiastical in nature, only that they [are] related to a pastoral appointment determination." *Minker,* 894 F.2d at 1357 (citing *Granfield,* 530 F.2d at 1047 (salary of priests an internal religious question)).

The ministerial exception has not been limited to members of the clergy. It has also been applied to lay employees of religious institutions whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship . . . ." *Rayburn v. General Conference of Seventh-day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985) (internal quotation marks and citation omitted). If their positions are "important to the spiritual and pastoral mission of the church," they "should be considered 'clergy.'" *Id. See also Scharon,* 929 F.2d at 362–63 (position of hospital chaplain is "primarily a 'ministerial' position"); *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir.1981) (for purposes of exception, "ministers" includes non-ordained faculty at Baptist seminary where no course has "a strictly secular purpose"); *Powell v. Stafford,* 859 F.Supp. 1343, 1346–47 (D.Colo.1994) (theology teacher at Catholic high school). In this case, the district court found that Sister McDonough's employment met this "ministerial function" test. *Catholic University,* 856 F.Supp. at 10–11.

### 2. Did the Ministerial Exception Survive Smith?

 Appellants argue that the district court erred in dismissing this case under the ministerial exception because, in their view, that exception did not survive the Supreme Court's decision in *Employment Division, Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Supreme Court addressed the issue of "whether the Free Exercise Clause . . . permit[ted] the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug." *Id.* at 874, 110 S.Ct. at 1597. In holding that the Clause did not require Oregon to permit the religious use of peyote, the Court explained that

the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes . . . conduct that his religion prescribes . . . .

*Id.* at 879, 110 S.Ct. at 1600 (internal quotation marks omitted).

Relying on this language, appellants argue that because Title VII is a religion-neutral law of general applicability, the Free Exercise Clause does not bar its application to

ministers employed by religious organizations. They assert that the ministerial exception was based on a test applied in Free Exercise Clause cases before *Smith* that required the Government to demonstrate the existence of a compelling governmental interest that would justify the burden placed on the right of free exercise by a particular statute. They then argue that *Smith* rejected the compelling interest test in the case of religion-neutral laws of general application with the result that the ministerial exception has been stripped of its constitutional foundation. Catholic University does not challenge this reasoning; rather, it replies that the compelling interest test has been reinstated by the Religious Freedom Restoration Act of 1993, which was enacted by Congress in response to *Smith.* For her part, Sister McDonough challenges both the constitutionality of that act and its retroactive application to this case.

Whatever the constitutionality and effect of this statute, which we will address later, we disagree with appellants' conclusion that *Smith* requires the rejection of the ministerial exception. We acknowledge that the Court stated that it has "never held that an *individual's* religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate," *id.* at 878–79, 110 S.Ct. at 1600 (emphasis added), and that it has

> consistently held that the right of free exercise does not relieve an *individual* of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).

*Id.* at 879, 110 S.Ct. at 1600 (internal quotation marks and citation omitted) (emphasis added). It does not follow, however, that *Smith* stands for the proposition that a *church* may never be relieved from such an obligation. We say this for two reasons. First, the burden on free exercise that is addressed by the ministerial exception is of a fundamentally different character from that at issue in *Smith* and in the cases cited by the Court in support of its holding. The ministerial exception is not invoked to pro-

tect the freedom of an individual to observe a particular command or practice of his church. Rather, it is designed to protect the freedom of the church to select those who will carry out its religious mission. Moreover, the ministerial exception does not present the dangers warned of in *Smith.* Protecting the authority of a church to select its own ministers free of government interference does not empower a member of that church, "by virtue of his beliefs, 'to become a law unto himself.'" *Id.* at 885, 110 S.Ct. at 1603 (quoting *Reynolds v. United States,* 98 U.S. 145, 167, 25 L.Ed. 244 (1879)). Nor does the exception require "judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field." *Id.* at 887, 110 S.Ct. at 1604.

Second, while it is true that some of the cases that have invoked the ministerial exception have cited the compelling interest test, *e.g., McClure,* 460 F.2d at 558, *all* of them rely on a long line of Supreme Court cases that affirm the fundamental right of churches to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff,* 344 U.S. at 116, 73 S.Ct. at 154. *See, e.g., Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1871) ("questions of discipline, or of faith, or ecclesiastical rule, custom, or law [that] have been decided by the highest of .. church judicatories ... must [be] accept[ed] ... as final"); *Gonzalez,* 280 U.S. at 16, 50 S.Ct. at 7 ("it is the function of the church authorities to determine what the essential qualifications of a chaplain are"); *Kedroff,* 344 U.S. at 107–08, 73 S.Ct. at 150 ("Legislation that regulates church administration, the operation of the churches, the appointment of clergy ... prohibits the free exercise of religion."); *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 672, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697 (1970) ("we have been able to chart a course that preserved the autonomy and freedom of religious bodies").

We agree with the Fifth Circuit that "throughout these opinions there exists a spirit of freedom for religious organizations, an independence from secular control or manipulation...." *McClure,* 460 F.2d at 560

(internal quotation marks omitted). We have considered the autonomy of a religious body in the selection and training of its own clergy to be of critical importance. Thus, in *Minker*, we stated that "[w]e cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the 'gifts and graces' of a minister must be left to ecclesiastical institutions." 894 F.2d at 1357. We also reaffirmed that "[t]he Free Exercise Clause *precludes* governmental interference with ecclesiastical hierarchies, church administration, and appointment of clergy." *Id.* (quoting *King's Garden, Inc. v. FCC*, 498 F.2d 51, 56 (D.C.Cir.1974)) (emphasis added).

We acknowledge that *Kedroff* and the other Supreme Court cases that we and other courts have cited in support of the ministerial exception did not involve neutral statutes of general application. Nevertheless, we cannot believe that the Supreme Court in *Smith* intended to qualify this century-old affirmation of a church's sovereignty over its own affairs. *See* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum.L.Rev. 1373, 1397 (1981) (noting that the Supreme Court has been willing to extend the "right of church autonomy as far as necessary to include the cases before it.").

■ We conclude from our review of the Supreme Court's First Amendment jurisprudence that whereas the Free Exercise Clause guarantees a church's freedom to decide how it will govern itself, what it will teach, and to whom it will entrust its ministerial responsibilities, it does *not* guarantee the right of its members to practice what their church may preach if that practice is forbidden by a neutral law of general application. But even if we misread *Smith*, our finding that the application of Title VII would violate the Free Exercise Clause nevertheless survives under an exception to the general rule in *Smith* that we discuss below at the conclusion of our Establishment Clause analysis.

### 3. Does the Ministerial Exception Apply to Sister McDonough?

■ Sister McDonough argues that even if the ministerial exception is still valid, the district court applied it too broadly in this case. She emphasizes the fact that she is not an ordained minister and argues that her duties were not pervasively religious. We find her first assertion immaterial and disagree with the second.

■ In *Minker*, the only previous case in which we applied the ministerial exception, the plaintiff was an ordained minister. Accordingly, we had no need to determine whether the exception should extend to persons who, though not ordained, nevertheless performed "ministerial functions." 894 F.2d at 1358. As stated earlier, however, other courts have extended the exception to include employees of religious institutions whose duties are religious in nature. *See, e.g., Rayburn*, 772 F.2d at 1165 (associate pastor who had completed seminary training but was not ordained, and whose role involved preaching and other "evangelical, liturgical, and counselling responsibilities"); *Southwestern Baptist*, 651 F.2d at 280, 283 (seminary faculty who instructed seminarians in the "whole of religious doctrine," were predominantly ordained ministers, and were evaluated primarily on their "Christian character, positive and consecrated attitudes, [and] faithful allegiance to the Baptist faith" and only secondarily on their scholastic attainments). We find their logic persuasive and agree that the ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission. *See Rayburn*, 772 F.2d at 1169.

We therefore consider whether Sister McDonough's responsibilities as a member of the Canon Law Faculty would be essentially religious. In making this determination, we ask whether her "primary duties [would] consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Id.* (quoting B. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 Colum.L.Rev. 1514, 1545 (1979)). Sister McDonough clearly fits this description. She would be a member of an ecclesiastical faculty whose stated mission is to "foster and teach sacred

doctrine and the disciplines related to it." *Canonical Statutes of the Ecclesiastical Faculties of The Catholic University of America* ("Canonical Statutes"), Part I, Sec. 2. *See also id.*, Part II, Sec. 3(c) (purposes of the ecclesiastical faculties include the instruction of students in "ministerial studies"). The courses taught by the Canon Law Faculty are designed

> to prepare the student for the professional practice of canon law—in diocesan and religious curias and in ecclesiastical tribunals—for the teaching of canon law, and for scientific canonical research.

*Statutes of the Ecclesiastical Faculty of Canon Law*, Part I. As a member of that faculty, she would be entrusted with instructing students in the "fundamental body of ecclesiastical laws" that governs the Church's sacramental life, defines the rights and duties of its faithful and the responsibilities of their pastors, and guides its administration. *See Code of Canon Law*, xxix-xlii ("Outline of the Code by Canons").

We find, moreover, that the role performed by the faculty is vital to the spiritual and pastoral mission of the Catholic Church. The Department is the sole entity in the United States empowered by the Vatican to confer ecclesiastical degrees in canon law. To this end, the University requires that the courses and programs of the Department "be conducted according to norms and regulations promulgated by the Holy See." *Special Statutes for Pontifical Schools*, Part II, Faculty Handbook of The Catholic University of America ("Faculty Handbook") at 25. Thus the University's ecclesiastical faculties serve as the instruments established by the Catholic Church in the United States for teaching its doctrines and disciplines.

It is important to note in this respect the role that the Canon Law Faculty plays in the graduate education of American priests. Although members of the laity have recently been allowed to enroll in the Department, over 95 percent of the students in the Department between 1983 and 1993 were ordained or members of a religious order. *Catholic University*, 856 F.Supp. at 4. In those same years, 26 of the 37 Doctorates of Canon Law awarded by the Department went to priests; of the remaining eleven degrees, eight were awarded to members of religious orders and only three to laymen. *Id.* In short, members of the Canon Law Faculty perform the vital function of instructing those who will in turn interpret, implement, and teach the law governing the Roman Catholic Church and the administration of its sacraments. Although Sister McDonough is not a priest, she is a member of a religious order who sought a tenured professorship in a field that is of fundamental importance to the spiritual mission of her Church. That the Canonical Statutes reserve in the Vatican a veto over appointments to tenured positions in the Canon Law Faculty (*see* p. 4–5 *supra*) confirms our understanding of their pastoral and spiritual significance. Cf. concurring opinion at 475–76.

In light of the foregoing, we reject Sister McDonough's attempt to liken her situation to those of the plaintiffs in cases such as *Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038 (8th Cir.1994); *Geary v. Visitation of the Blessed Virgin Mary Parish School*, 7 F.3d 324 (3d Cir.1993); and *DeMarco v. Holy Cross High School*, 4 F.3d 166 (2d Cir.1993), in which the First Amendment was not found to bar the adjudication of employment discrimination claims. Those cases are readily distinguished because the functions performed by the plaintiffs were not ministerial. For example, in *Weissman*, the plaintiff was able to bring an age discrimination action against his temple without violating the First Amendment because

> Weissman was responsible for logistical support of activities including supervision of administrative, clerical, building maintenance, and custodial personnel. He also managed property and equipment and maintained financial records. He was not a member of the clergy and played no role in decisions relating to spiritual matters.

38 F.3d at 1040. *See also Geary*, 7 F.3d at 331 (lay teacher in elementary parochial school); *DeMarco*, 4 F.3d at 171–72 (lay math teacher).

That the University did not assert any religious basis for denying Sister McDonough tenure does not affect our conclusion;

nor does the fact that her application never reached the ecclesiastical levels of review. The focus under the ministerial exception is on the action taken, not possible motives:

> [T]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content.

*Rayburn,* 772 F.2d at 1169. As we noted in *Minker,* "[w]e need not find that the factors relied upon by the Church were independently ecclesiastical in nature, only that they were related to a pastoral appointment determination." 894 F.2d at 1357.

Because Sister McDonough's employment as a tenured member of the Department of Canon Law so clearly meets the ministerial function test, we affirm the district court's dismissal of Sister McDonough's claims on the basis of the Free Exercise Clause.

### B. The Establishment Clause

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court established a three-part test for determining whether a statute violates the Establishment Clause:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.

*Id.* at 612–13, 91 S.Ct. at 2111 (citation and internal quotation marks omitted).

The district court concluded that

> [t]he monitoring of and investigation into the tenure decisions of the Canon Law Department by the EEOC and the courts, and the possible judicial involvement in a larger doctrinal intra-church controversy, has impermissibly entangled the civil authorities in religious decision-making, and would do so in the future.

*Catholic University,* 856 F.Supp. at 13. Although it is difficult to attach a precise meaning to the word "entanglement," courts have found an unconstitutional entanglement with religion in situations where a "protracted legal process pit[s] church and state as adversaries," *Rayburn,* 772 F.2d at 1171, and where the Government is placed in a position of choosing among "competing religious visions." *Geary,* 7 F.3d at 330. In this case, the court found that the controversy over Sister McDonough's qualifications for tenure placed it in the impermissible position of having "to evaluate ... competing opinions on religious subjects," and that the EEOC's "prolonged monitoring and investigation" violated the Establishment Clause. *Catholic University,* 856 F.Supp. at 9, 12.

#### 1. Assessing Sister McDonough's Qualifications to be a Tenured Professor of Canon Law

Catholic University asserted that it had denied Sister McDonough's application because her teaching and scholarship failed to meet the standards required of a tenured member of the Canon Law Faculty. The central issue at trial was whether those reasons were pretextual. The parties introduced an extensive body of conflicting testimony concerning the quality of Sister McDonough's publications, which she concedes "were of a religious nature." Reply Brief for Appellant McDonough at 18. Of the eighteen witnesses called to testify concerning her qualifications, fourteen were clergy or members of a religious order.

In dismissing the action on Establishment Clause grounds, the district court explained:

> [A] trier of fact chooses between competing expert opinions. There are such competing expert opinions as to the quality and, necessarily, the religious substance of Sister McDonough's writings in this record. I find and conclude that it is neither reasonably possible nor legally permissible for a lay trier of fact to evaluate these competing opinions on religious subjects.

*Catholic University,* 856 F.Supp. at 9. The EEOC nevertheless insists, based on *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), that this dispute can be

resolved without entangling the Government "in questions of religious doctrine, polity, and practice" by invoking "neutral principles of law" that "rel[y] on objective, well established concepts of . . . law familiar to lawyers and judges." Brief for Appellant EEOC at 23 (quoting *Jones*, 443 U.S. at 603, 99 S.Ct. at 3025). *Jones*, however, dealt with a dispute over church property, and the "neutral principles" to which the Supreme Court referred were those embodied in trust and property law. As we pointed out in *Minker*, the neutral principles test adopted in *Jones* will only "permit[ ] a court to interpret provisions of religious documents involving . . . non-doctrinal matters *as long as the analysis can be done in purely secular terms*." 894 F.2d at 1358 (emphasis added).

Although an assessment of scholarship undoubtedly involves objective criteria that are independent of religious content, the clergy and members of religious orders who were asked to evaluate Sister McDonough's publications could not escape the knowledge that they were being asked to determine whether she was qualified for a position in which she would "teach in the name of the Church." *Canonical Statutes*, Part V, Sec. 4. Under the circumstances, there was the inevitable risk that the persons assessing the scholarship of a particular paper would consider whether her conclusions were in accord with what the Church teaches or what, in their judgment, the Church ought to teach.

Judge Oberdorfer attempted to decide the case in accordance with neutral principles; but after a week of trial, he found that "no expert testimony c[ould] effectively filter out the religious elements from the secular ones sufficiently to avoid unwholesome and impermissible entanglement with religious concerns." *Catholic University*, 856 F.Supp. at 12. That a judge of his experience should have reached this conclusion is perhaps the best evidence that the pretext inquiry would have required him "to choose between [the witnesses'] competing religious visions." *Geary*, 7 F.3d at 330.

Finally, while it is true that the Senate CAP was a secular body and that it examined her qualifications in accordance with the secular criteria set forth in the Faculty Handbook, *see* concurring opinion at 471–72, it is by no means clear that its decision was unaffected by religious considerations. In reviewing Sister McDonough's credentials, the Senate CAP was required to consider, among other factors, "[t]he purpose of [her] appointment . . . in relation to the mission and needs of the [Canon Law] Department. . . . ." Faculty Handbook, Part II, Art. 13. The mission of that Department, of course, is religious; and we cannot determine the degree, if any, to which that body was influenced by the votes against tenure that had been cast by members of the Canon Law Faculty, all of whom were priests who may have questioned Sister McDonough's qualifications on religious grounds. What the record does reveal is that the Senate CAP declined to recommend tenure in part because some members of the departmental faculty had opposed her candidacy. *See* p. 6 *supra*.

In light of the above, we agree with Judge Oberdorfer that "[c]ivil courts should not be entangled in such disputes." *Catholic University*, 856 F.Supp. at 12.

### 2. The EEOC's Investigation and Litigation

As the Supreme Court has observed, "[i]t is not only the conclusions that may be reached by [an agency] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502, 99 S.Ct. 1313, 1320, 59 L.Ed.2d 533 (1979). *Cf. Aguilar v. Felton*, 473 U.S. 402, 413, 105 S.Ct. 3232, 3238, 87 L.Ed.2d 290 (1985) ("pervasive monitoring by public authorities in the sectarian schools infringes precisely on those Establishment Clause values at the root of the prohibition of excessive entanglement.").

■ An excessive entanglement may occur where there is a sufficiently intrusive investigation by a government entity into a church's employment of its clergy. In *Young*, for example, the Seventh Circuit stated that "civil court review of ecclesiastical decisions . . . [,] particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and

practice, and hence forbidden by the First Amendment." 21 F.3d at 187 (construing *Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372) (emphasis in original). Although we did not address the Establishment Clause in *Minker,* we nevertheless observed that "any inquiry into the Church's reasons for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs." 894 F.2d at 1360.

■ In this case, the EEOC's two-year investigation of Sister McDonough's claim, together with the extensive pre-trial inquiries and the trial itself, constituted an impermissible entanglement with judgments that fell within the exclusive province of the Department of Canon Law as a pontifical institution. *See Rayburn,* 772 F.2d at 1171 (noting that a Title VII action is a "potentially ... lengthy proceeding" that could subject church personnel and records to subpoena, discovery, and cross-examination). This suit and the extended investigation that preceded it has caused a significant diversion of the Department's time and resources. Moreover, we think it fair to say that the prospect of future investigations and litigation would inevitably affect to some degree the criteria by which future vacancies in the ecclesiastical faculties would be filled. Having once been deposed, interrogated, and haled into court, members of the Department of Canon Law and of the faculty review committees who are responsible for recommending candidates for tenure would do so "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the ... needs" of the Department. *Id.*

These conclusions are a sufficient basis for affirming the district court's dismissal of this case under the Establishment Clause. We think it worth noting, nevertheless, that those conclusions also bring this case within an exception to the rule in *Smith* that the right of free exercise is not a defense against the application of a neutral law of general application, such as Title VII. There, the Court specifically identified a class of cases in which it held "that the First Amendment bars application of a neutral, generally applicable law." *Smith,* 494 U.S. at 881, 110 S.Ct.

at 1601. These cases "have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections. ..." *Id.* Among the examples cited by the Court are *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (combination of free exercise and freedom of speech concerns), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (combining free exercise concerns with the right of parents to direct the education of their children). *Smith,* 494 U.S. at 881, 110 S.Ct. at 1601. We have demonstrated that the EEOC's attempt to enforce Title VII would both burden Catholic University's right of free exercise and excessively entangle the Government in religion. As a consequence, this case presents the kind of "hybrid situation" referred to in *Smith* that permits us to find a violation of the Free Exercise Clause even if our earlier conclusion that the ministerial exception survived *Smith* should prove mistaken.

## C. The Religious Freedom Restoration Act

■ The ministerial exception is judicial shorthand for two conclusions: the first is that the imposition of secular standards on a church's employment of its ministers will burden the free exercise of religion; the second, that the state's interest in eliminating employment discrimination is outweighed by a church's constitutional right of autonomy in its own domain. Catholic University argues, essentially, that even if *Smith*'s rejection of the compelling interest test undermined the exception, the test and the exception were revalidated by the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb, *et seq.* (Supp.V.1993) ("RFRA" or "Act").

■ If the University is right, it wins the case on this basis alone because we have concluded above that Title VII impermissibly burdens Catholic University's free exercise of religion and because, in *Minker,* we made the implicit finding, which we today make explicit, that the Government's interest in eliminating employment discrimination is insufficient to overcome a religious institution's interest

in being able to employ the ministers of its choice. *See Minker,* 894 F.2d at 1357. Appellants ask us to reject the University's argument on three grounds: (1) the University has waived the right to invoke RFRA on appeal because it failed to do so before the district court; (2) the Act is unconstitutional; and (3) even if it is constitutional, the Act cannot be applied retroactively.

RFRA provides, in pertinent part:

**§ 2000bb. Congressional findings and declaration of purposes**

\* \* \* \* \* \*

**(b) Purposes**

· The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963), and *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

**§ 2000bb–1. Free exercise of religion protected**

**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b) Exception**

*Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—*

(1) *is in furtherance of a compelling governmental interest;* . . . .

42 U.S.C. §§ 2000bb, 2000bb–1 (emphasis added).

▇▇▇ Although we remain persuaded that *Smith* did not affect the ministerial exception, we will now examine appellants' arguments against our applying RFRA to this case. As a threshold matter, we will dispose of their assertion that RFRA does not have retroactive effect. Although statutes are

presumed to apply only prospectively, that presumption does not attach where "Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). Here, Congress's intent could not be clearer. RFRA expressly states that it "applies to all Federal . . . law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb–3(a). *See Brown–El v. Harris,* 26 F.3d 68, 69 (8th Cir.1994) ("the [RFRA] applies retroactively"). Thus the Act has, in effect, incorporated a statutory "compelling interest" test into Title VII that Catholic University is entitled to invoke if appellants' other objections are met.

▇▇▇ With respect to the argument that Catholic University has waived its right to invoke RFRA, we agree that, as a general rule, we will not consider an argument raised for the first time on appeal. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We are not persuaded, however, that Catholic University's invocation of RFRA raises a "new argument" for purposes of the waiver rule. The gravamen of the University's argument is not that it is entitled to the statutory defense created by RFRA; rather, it asserts that RFRA has merely restored the pre-*Smith* free exercise jurisprudence on which it relied before the district court, including the availability of the compelling interest test. *See* Brief for Appellee Catholic University at 14 ("[b]ecause RFRA establishes . . . heightened protection for the exercise of religion . . . [p]roper analysis of the Free Exercise Clause issues involves consideration of the pre-*Smith* cases").

The district court accepted the arguments that Catholic University made on the constitutional issue; namely, that the application of Title VII to the University would violate the Free Exercise Clause on the basis of the ministerial exception as supported by the pre-*Smith* case law. If we were to conclude that the court came to the right conclusion through erroneous reasoning because it failed to take the effect of *Smith*'s rejection of the compelling interest test on the exception and the exception's subsequent restora-

tion by RFRA, we could nonetheless affirm the court by taking account of the Act and its retroactive effect. *See Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937) ("if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason"); *see also Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 99, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991) ("[w]hen an issue ... is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law"). The applicability of Title VII to Sister McDonough's employment is an issue properly before this court. Because taking the Act into account does not require new fact-finding, we will exercise our authority to take cognizance of RFRA as it applies to that issue.

We now reach the question of RFRA's constitutionality. Sister McDonough argues that the Act is unconstitutional for three reasons: it violates the separation of powers doctrine, Congress lacked the constitutional authority to enact it, and it violates the Establishment Clause. While several commentators have raised significant concern as to the constitutionality of RFRA, *see, e.g.,* Christopher L. Eisgruber & Lawrence G. Sager, *Why the Religious Freedom Restoration Act is Unconstitutional,* 69 N.Y.U.L.Rev. 437 (1994), the only circuit court of appeals to squarely address the issue has upheld its constitutionality. *See Flores v. City of Boerne, Texas,* 73 F.3d 1352 (5th Cir.1996); *but see Hamilton v. Schriro,* 74 F.3d 1545, 1557 (8th Cir.1996) (McMillian, J., dissenting) (concluding that RFRA is unconstitutional).

■■■ Before turning to Sister McDonough's specific challenges, we call attention to two principles that govern the scope of a court's inquiry into the constitutionality of a federal statute. The first of these is the "principle of the law of federal courts that constitutional issues affecting legislation will not be determined ... in broader terms than are required by the precise facts to which the ruling is to be applied," *Hastings v. Judicial Conference of the United States,* 770 F.2d 1093, 1100 (D.C.Cir.1985) (internal quotations omitted); accordingly, we will limit our inquiry and conclusions to the constitutionality of the Act as it relates to Sister McDonough's Title VII claim. The second principle requires that a court faced with a challenge to the constitutionality of a federal law " 'first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.' " *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971) (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932)).

■■■ *Separation of Powers.* Sister McDonough maintains that RFRA violates the separation of powers doctrine by attempting to overturn the Supreme Court's interpretation of the Free Exercise Clause. She would, of course, be right if that was what the Act purported to do. Although the first paragraph of RFRA's statement of purposes could be read to support her position, *see* 42 U.S.C. § 2000bb(b)(1), the presumption of constitutionality and, we believe, the more natural reading of the Act's provisions lead us to conclude that Congress's objective in enacting the statute was to overturn the *effects* of the *Smith* decision, not the decision itself. The Act does nothing more than substitute a statutory test for the constitutional test that *Smith* found not to be mandated by the Free Exercise Clause in cases where the right of free exercise was burdened by a neutral law of general application. As the Fifth Circuit observed in *Flores,* the "RFRA does not usurp the judiciary's authority to say what the law is any more than did the Voting Rights Act of 1964 when it prohibited literacy tests after *Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), had upheld their constitutionality." 73 F.3d at 1363 (citations omitted).

■■■ *Constitutional Authority.* After making the unimpeachable point that Congress may only act pursuant to an enumerated power, Sister McDonough contends that Congress acted beyond its authority in enacting RFRA because "[t]he First Amendment

of the Constitution does not empower Congress to regulate federal law in order to achieve religious liberty." Reply Brief for Appellant McDonough at 7. Her argument conflates, however, an enumerated power claim with the quite distinct contention that a given congressional act violates the Establishment Clause. We doubt that she would argue that Congress lacks at least the facial authority to determine against whom, and under what circumstances, Title VII and other federal laws will be enforced. Rather, her complaint is that as a consequence of the enactment of RFRA, those enforcing the laws must now take cognizance of their effect on the free exercise of religion. That question is subsumed in her third challenge, which we now address.

*Establishment Clause.* Sister McDonough asserts that the Act violates the Establishment Clause by according religion a privileged status. Reply Brief for Appellant McDonough at 6 (citing *Board of Education of Kiryas Joel Village School District v. Grumet,* — U.S. —, —, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994) (Congress violates the Establishment Clause by "prefer[ring] one religion to another, or religion to irreligion")). But in noting with apparent approval that several States had authorized the sacramental use of peyote, the Court observed, in *Smith,* that "a society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well" and that "to say that a nondiscriminatory religious-practice exemption is permitted ... is not to say that it is constitutionally required...." 494 U.S. at 890, 110 S.Ct. at 1606.

Justice O'Connor's concurring opinion in *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), places this matter in the proper perspective. In that opinion, she explained the critical distinction between an "accommodation" and an "endorsement" of religion:

> The necessary first step in evaluating an Establishment Clause challenge to a government action lifting from religious organizations a generally applicable regulatory burden is to recognize that such government action *does* have the effect of advancing religion. The necessary second step is to separate those benefits to religion that constitutionally accommodate the free exercise of religion from those that provide unjustifiable awards of assistance to religious organizations.... [T]he inquiry framed by the *Lemon* test should be "whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement."

*Id.* at 348, 107 S.Ct. at 2874–75 (O'Connor J., concurring), *cited with approval in County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 601 n. 51, 109 S.Ct. 3086, 3105 n. 51, 106 L.Ed.2d 472 (1989). We agree with the Fifth Circuit that RFRA represents nothing more sinister than a "legislatively mandated accommodation of the exercise of religion." *Flores,* 73 F.3d at 1364.

In light of the above, we conclude that Congress had the authority, under the Constitution, to create a compelling interest defense for the benefit of those whose free exercise rights would be burdened by a neutral *federal* law of general application. (As the issue is not before us, we do not decide whether Congress was empowered to include state laws within the reach of the Act. *See* 42 U.S.C. § 2000bb–3(a) (statute "applies to all Federal and State law")).

### III. CONCLUSION

For the foregoing reasons, we find that the EEOC's and Sister McDonough's claims are barred by the Free Exercise and the Establishment Clauses of the First Amendment and by RFRA. The judgment of the district court is therefore

*Affirmed.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

I, like the late esteemed Judge Gesell in *Minker,* "concur in the result and respectfully note my concerns." *Minker v. Baltimore Annual Conf.,* 894 F.2d 1354, 1361 (D.C.Cir. 1990). Although our concerns are not identical—the *Minker* court affirmed the district

court's early dismissal of the plaintiff's ADEA claim and Judge Gesell was reluctant, "without benefit of a factual record," to balance a "deep-seated respect for First Amendment religious protection against the virus of discrimination" whereas here we affirm the district court's dismissal of Sister McDonough's Title VII claim after a six-day bench trial—they nonetheless converge in warning against "[g]eneral propositions" and "absolutes" in a "difficult area" of the law, 894 F.2d at 1362, without a precise examination of the single record before us.

At the outset, I note that the insulating effect of the First Amendment's religion clauses was never felt by defendant The Catholic University of America (CUA) until the district court's post-trial, and apparently *sua sponte,* request for briefs "addressing the question whether the First Amendment precludes maintenance and adjudication of Sister McDonough's claims." [1] 856 F.Supp. at 2. From the beginning—now, over eight years ago—CUA, an indisputably sectarian institution (and no stranger to litigation [2]), viewed Sister McDonough's quest for tenure as an academic matter. Indeed, after the Senate Committee on Appointments and Promotions (Senate CAP) rendered its second decision unanimously declining to recommend tenure, and while the EEOC was conducting its investigation, Cardinal Hickey, the Archbishop of Washington and *ex officio* the CUA Chancellor, called the dispute a "purely internal, non-ecclesiastical, academic matter." [3] Joint Appendix (JA) 380. CUA endured the EEOC's two-year probe, apparently shouldering any burden on its free

exercise right without question. Of the eighteen witnesses who testified at trial, CUA called eleven of them; seven were clergy or persons religious. It appears that all testified free from, if not all, at least the forbidden entanglements. Even the trial judge, a constitutional law luminary, did not immediately see the light. While all of this may have little to do with whether the Court is empowered to hear Sister McDonough's claim, it indicates, at least to me, that the First Amendment's impact at this stage of the contest is far from clear.

At this stage we are reviewing only the November 1989 decision of the Senate CAP unanimously recommending against tenure.[4] Of the seven members of the Senate CAP, one member came from each of six departments: Lucy Cohen from Anthropology, Roland Nardone from Biology, Virgil Nemoianu from English and Comparative Literature, Catherine Cline from History, Yun Whang from Mechanical Engineering and Elizabeth Timberlake from Social Services. Only one, John Lynch, was from the Canon Law Department.[5] Its composition was thus overwhelmingly and indisputably secular; could its decision be anything but secular?

Both the CUA Faculty Handbook and the record in this case manifest what the seven had before them to evaluate. They had the Handbook, which provides that they are to review a tenure candidate, regardless of the department involved, according to nine criteria:

1. Before the court's request, CUA had not asserted a First Amendment defense to Title VII liability although it had argued that the court could not constitutionally grant Sister McDonough her requested relief namely, tenure.

2. *See, e.g., Granfield v. Catholic Univ. of Am.,* 530 F.2d 1035 (D.C.Cir.1976).

3. After Sister McDonough filed her EEO charge on January 18, 1990, she applied for a position with the Archdiocese of Washington and asked the Archbishop's opinion about her EEOC claim. His opinion is related in Sister McDonough's affidavit, the accuracy of which is not contested.

4. The first Senate CAP rejected Sister McDonough's tenure application in March 1989. At

that time the Senate CAP consisted of faculty from the departments of anthropology, biology, canon law, law, history and law, mechanical engineering and philosophy. The vote was three in favor of Sister McDonough's tenure application, one against and two abstentions. Sister McDonough appealed to CUA's Academic Vice President who remanded her application to the Senate CAP because of "substantive and procedural questions." 856 F.Supp. at 8. By the time of the November vote, "one of Sister McDonough's three supporters in April of 1989 was no longer serving on the Senate Committee, and two had changed their views." *Id.*

5. Lynch was also a professor in the History Department. Of the seven members, Lynch was the only Roman Catholic priest.

a. The purpose of the appointment ... in relation to the mission and needs of the Department, School, and University.

b. The candidate's competence as a teacher, including where applicable ability as a director of dissertations and or/director of clinical or field training. . . .

c. The candidate's present and projected competence and productivity as a research scholar.

d. The candidate's present and projected standing among scholars at comparable stages of their careers in the same field of specialization.

e. The indications that the candidate is one of the most qualified for the position. . . .

f. The candidate's commitment to the aims of the Department, School and University, as evidenced by interest in Departmental and University activities and by willingness to carry Committee responsibilities.

g. The candidate's ability to work with other members of the academic community.

h. The candidate's moral integrity, including respect for the ethical obligations of the teaching profession.

i. The candidate's involvement in professional organizations and activities.

*The Catholic University of America Faculty Handbook,* JA 53–54. They had Sister McDonough's revised application. The application listed the courses she taught and her publications and noted that she had either directed or read thirty-eight dissertations; it also contained published reviews of her publications, letters of recommendation from both professionals and former students,[6] a written evaluation of each of her published works by the Chairman of the School of Religious Studies [7] (SRS) and recent students' evaluations.[8] Plaintiff's Trial Exhibit # 54 (Recommendation for Appointment with Continuous Tenure). They also had copies of her twelve publications. Finally, they had the evaluations of six canon law experts from outside CUA (some from outside the country). The Chairman of the Canon Law Department contacted four of the evaluators from a list proposed by Sister McDonough. These evaluators submitted public letters. CUA's Academic Vice President later selected two outside evaluators who submitted confidential evaluations.

The six outside evaluators included: Reverend Richard Hill, S.J., J.C.D., Professor of Canon Law at The Jesuit School of Theology in Berkeley, California; Professor Michael O'Reilly, O.M.I., Assistant Professor of Canon Law at Saint Paul University in Otta-

**6.** Sister McDonough included the letters of nine former students. Their letters contained comments about her teaching ability, including:

[Sister McDonough] taught General Norms and Latin. Both difficult courses to teach and for first year students to comprehend. The subject matter was unpopular, the frustration level was exceedingly high and the course load very demanding. I admire the fact that in the face of that [Sister McDonough] held out for quality, not popularity. She was not content that we learn the subject matter but that we learned how to study, how to approach questions, how to do research, how to prepare for comprehensives, how to write a thesis. I think that she is an excellent teacher in that she believes in "leading students out" beyond where they are.

Plaintiff's Trial Exhibit # 54 at 230.

**7.** For example, the Chairman assessed one article as follows:

This is a careful analysis of an issue not generally discussed in canon law studies on reli-

gious. It includes a careful analysis of the law, and shows insight in developing a system of analysis not found elsewhere. The article is a serious canonical study.

Plaintiff's Trial Exhibit # 54 at 17.

**8.** In two summaries of student evaluations sent to Sister McDonough by the Chairman of the Canon Law Department, the Chairman stated:

The students valued your work in this course, as is evident from the numbered responses. The written comments are quite positive, and point to several elements of the course which proved very helpful: the materials, case studies, class presentations, and your own availability outside the classroom.

The evaluations are quite positive, expressing appreciation for the seminar format, the use of a syllabus, and the lively discussions. The readings were generally "overwhelming" or "voluminous," but there were no real objections to them.

Plaintiff's Trial Exhibit # 54 at 650, 689.

wa, Canada; Reverend John M. Huels, O.S.M., Associate Professor of Canon Law at the Catholic Theological Union in Chicago, Illinois; Reverend David M. Hynous, O.P., Vice–Chancellor of the Archdiocese of Chicago, Illinois; Professor Dr. Heinz–Meihnhold Stamm, O.F.M., Dean of the Faculty of Canon Law at the Pontificium Athenaeum Antonianum in Rome.[9] Their evaluations spoke in academic terms. Hill described Sister McDonough as a "productiv[e] ... scholar [who] ... reasons critically ... writes clearly" and is "setting the pace" compared to her peers. He therefore "did not hesitate to recommend her to The Catholic University of America for promotion to continuous tenure." Supplemental Joint Appendix (SJA) 2. O'Reilly (one of the confidential evaluators) considered the "volume of her output" and "the high quality of her writings" in deciding to "strongly recommend that she be given tenure." SJA 24. Huels commented that "[i]n the area of religious law, she is, in my opinion, the most capable scholar in the United States." SJA 4. Hynous agreed: "As to a comparison of her work with those of her peers, she is far ahead of them." SJA 15. Similarly, Stamm concluded that "from my point of view, there is no argument against the promotion of Prof. Dr. McDonough." SJA 17 (translation from German original).[10]

In the face of these "high marks" in scholarship, output and professional relevance given to Sister McDonough's publications, the Senate CAP nonetheless gave three reasons for its decision to reject her tenure application: (1) "scholarship of the candidate does not measure up to the standards expected in the field," (2) "marginal performance in teaching and scholarly publications," (3) and no assurance " 'beyond reasonable doubt,' " in light of the split votes of the Canon Law Department and the SRS CAP, that Sister McDonough " 'possesses ... the optimal

qualifications for the position.' " Plaintiff's Trial Exhibit # 49 (Letter of Nemoianu dated 11/15/89, quoting Faculty Handbook). Not surprisingly, not a word touching on "matters of church government, as well as those of faith and doctrine," *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952), and nothing relating to " 'voice of the church' " concerns. *Minker,* 894 F.2d at 1358. And to the extent the Senate CAP took into account the Canon Law Department's and the SRS CAP's lack of unanimity on Sister McDonough's tenure qualifications, it appears that it did no more than count noses—there is no indication that it considered, or knew of, any differing religious opinions among the two faculty groups that affected their differing assessments of Sister McDonough.[11] In fact, according to the record, the Canon Law Department faculty split over such nonreligious issues as Sister McDonough's teaching style ("available to students" versus " 'high school marm' approach"). 856 F.Supp. at 7. The Department's disagreement resulted in a tie vote, three for and three against tenure. The SRS CAP, again by a split vote (3–2), reached a different result, recommending Sister McDonough for tenure. It summarized its decision: "[T]he majority felt that the candidate fulfilled tenure requirements as a teacher, researcher and writer, and in service to the department, school, and university, along with the greater church community." JA 560. Its reasons could be, and undoubtedly have been, applied to a tenure candidate in any department at CUA.

That a sectarian institution can take secular, and therefore reviewable, action has been recognized by many courts, including ours. *See, e.g., EEOC v. Mississippi College,* 626 F.2d 477, 488–89 (5th Cir.1980) (allowing psy-

---

**9.** The sixth letter from Bruno Primetshofer, a Catholic Theology faculty member at The University of Vienna, was written in German. There is no translation included in the record.

**10.** Testifying about the "minuses of Dr. McDonough's file," the Senate CAP Chairman stated that "all six letters expressed a number of reservations and hedgings or qualifications about Dr. McDonough's tenure." JA 388. His character-

ization of the evaluations does not appear to square with their contents.

**11.** The split votes by themselves indicate nothing unless CUA were to argue that the Senate CAP never recommended tenure if the candidate's department (and/or school) was less than unanimous in its recommendation. There is nothing in the record or briefs suggesting such an argument.

chologist denied full-time faculty position to bring Title VII claim against sectarian university); *Geary v. Visitation of the Blessed Virgin Mary Parish Sch.*, 7 F.3d 324 (3d Cir.1993) (permitting lay teacher to bring ADEA claim against parochial school); *De-Marco v. Holy Cross High School*, 4 F.3d 166 (2d Cir.1993) (same); *Ritter v. Mount St. Mary's College*, 814 F.2d 986, 988 n. 1 (4th Cir.1987) (noting education professor's ADEA claim "did not present a significant risk of infringement upon the First Amendment rights of Mount Saint Mary's College"), *overruled on other grounds, Lytle v. Household Mfg. Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Soriano v. Xavier Univ. Corp.*, 687 F.Supp. 1188, 1189 (S.D. Ohio 1988) (permitting suit by employee of sectarian university); *Welter v. Seton Hall Univ.*, 128 N.J. 279, 608 A.2d 206, 212 (1992) (allowing nuns teaching computer science at sectarian university to bring claim alleging breach of employment contract); *see generally Jones v. Wolf*, 443 U.S. 595, 606, 99 S.Ct. 3020, 3026–27, 61 L.Ed.2d 775 (1979) (courts may resolve claims which involve "the manner in which the churches own property, hire employees, or purchase goods"); *Minker*, 894 F.2d at 1360 (allowing contract claim against religious institution because "the first amendment does not immunize the church from all temporal claims made against it"); *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035 (D.C.Cir.1981) (permitting anti-trust claim against religious officials); *Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038 (8th Cir.1994) (allowing ADEA claim against synagogue); *cf. EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir.1981) (holding that Title VII does not apply to seminary faculty); *Maguire v. Marquette Univ.*, 627 F.Supp. 1499 (E.D.Wis. 1986) (exempting from Title VII sectarian university decision not to hire theology professor), *aff'd Maguire v. Marquette Univ.*, 814 F.2d 1213 (7th Cir.1987). The Senate CAP makes *only* secular decisions, whether it reviews the qualifications of a tenure candidate in the Physics Department or the Canon Law Department. The fact that religious authorities *separately* assess a Canon Law Department candidate because of that Department's *separate* relationship with the Vatican does not change the nature of the Senate CAP's decision. Nor are *we* asked or required to "probe the mind of the church." *Minker*, 894 F.2d at 1360 (quoting *Rayburn v. General Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1171 (4th Cir.1985)). Instead, we are reviewing the secular decision of secular agents of a sectarian institution.[12] And, as the record makes clear, its decision derived from purely academic (i.e., nonreligious) considerations. Any burden on CUA's free exercise right had not yet been borne; any excessive entanglement had not yet occurred.

I agree with both the majority and the district court that it was at the "pretext" stage of the trial that First Amendment questions came into play.[13] Why was this? Sister McDonough compared her qualifications to two male tenured professors in the Canon Law Department who, the court found, compared well in some respects and not so well in others. Significantly, the court initially compared the two of them to Sister

---

**12.** It is also clear that the Senate CAP's decision is the *only* one we need review; if it had voted to recommend tenure, Sister McDonough's application would have proceeded to the next level notwithstanding the Canon Law Department's negative vote.

**13.** As a Title VII plaintiff, Sister McDonough was required to prove by a preponderance of the evidence that CUA unlawfully discriminated against her. *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–12, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). At trial, McDonough offered her *prima facie* case of unlawful disparate treatment by presenting evidence that she was a member of a protected class, qualified for tenure, applied for and was denied tenure and the tenured position remained open. *See* Trial Tr. vol.

II at 174; *see Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507 (D.C.Cir.1995); *Bennun v. Rutgers State University*, 941 F.2d 154, 170 (3d Cir.1991). In response, CUA presented its evidence of *bona fide* nondiscriminatory reasons for its action and Sister McDonough challenged the reasons as pretextual. *See Hicks*, 509 U.S. at 504–08, 113 S.Ct. at 2746–47 (describing "burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases" set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Sister McDonough retained the "ultimate burden of persuasion" that CUA unlawfully denied her tenure. *See Hicks*, 509 U.S. at 510–12, 113 S.Ct. at 2749.

McDonough in teaching skills and quantity of publications, both academic matters. 856 F.Supp. at 9. In addition, the court noted that one of the two had a "unique dual-expertise in civil and canon law, having received a J.D. from Harvard Law School" and that he had won tenure when the Canon Law Department enrollment had been expected to increase, implying a lower threshold. *Id.* These differences were unquestionably academic (and therefore secular) and could apply in any tenure setting. In fact, the trial judge observed: "It is possible for a court to compare the quantity of published articles and, to some extent, the teaching evaluations." *Id.* Had the evidence ended there, he would have done the comparison and made the decision.[14] The First Amendment's religion clauses would not yet have been implicated.

But the district court then heard evidence that understandably distracted it from assessing whether the Senate CAP's stated reasons for not recommending tenure were pretextual.[15] In order to make that assessment, the district court needed only to review what that body reviewed to determine if Sister McDonough's scholarship did not "measure up," if her performance in teaching and scholarly publications was "marginal" and if it could not say beyond a reasonable doubt that she possessed "optimal" qualifications. That CUA chose to defend its secular agent's secular decision by relying on expositions of ecclesiastical esoterica that were, in the main, irrelevant because not relied on by that agent—and that Sister McDonough chose to show pretext by the same method—made the court's job more difficult but not outside its jurisdiction.[16] Had the court limited the inquiry to a review of the Senate CAP's stated reasons as well as the substance of what that body reviewed, whether CUA would have carried the day by establishing "legitimate, nondiscriminatory reasons" or contrariwise Sister McDonough could have successfully shown discrimination, is, to state the obvious, an open question. By our affirmance, it remains an open question.[17]

I concur in the result, rather than dissent, for one reason. Although, as already noted, I believe the dispute at this stage does not implicate the First Amendment's religion clauses, it will eventually do so.[18] The district court recognized as much:

14. In ruling on the admissibility of the plaintiff's exhibits, the trial judge stated: "I don't think I can do anything beyond dealing sort of as if I were reviewing the decision of an administrative agency. What was before the various decision-making bodies in connection with her application." Trial Tr. vol. II at 147. Both sides called as witnesses various members of one of the two Senate CAPs—McDonough called Maxwell Bloomfield (a legal history and law professor who served on the first Senate CAP) while CUA called Cohen, Nemoianu, Timberlake and Wippel.

15. Both Sister McDonough and CUA called members of the Canon Law Department. Six current or former members, all Roman Catholic priests, and Reverend Hill, testified about the quality of her publications. It was this testimony that the district court eventually concluded led it into the First Amendment thicket. 856 F.Supp. at 9 ("The issue ... necessarily involves the quality, and hence the substance, of her work. That substance is materially religious.... There are [] competing expert opinions as to the quality and, necessarily, the religious substance of Sister McDonough's writings in this record.").

16. The trial judge may have permitted the testimony because of his mistaken view that the Canon Law Department was Sister McDonough's employer. His memorandum opinion includes several references to that effect. 856 F.Supp. at 5, 6, 13. For this reason he concentrated on the Canon Law Department, not CUA, as the relevant "religious institution." *Id.* at 9, 10, 13. In fact, CUA was Sister McDonough's employer. *Notice of Appointment*, JA 38–43 (employment contracts signed by CUA Provost and Sister McDonough).

17. Although it has not influenced my decision to concur in the result, I note that Sister McDonough, like the plaintiff in *Minker*, also brought a breach of contract claim which was dismissed before trial by the trial judge's predecessor. The trial judge declined to reconsider the dismissal, concluding that it constituted the law of the case, but reminded the plaintiff of her right to appeal the dismissal. 4/25/93 Pre–Trial Conf.Tr. at 62 ("If he's wrong, you have to get it fixed on appeal.") The dismissal was not appealed. Had it been, Sister McDonough, again like the plaintiff in *Minker*, 894 F.2d at 1360, might well have enjoyed her day in court on the breach of contract claim.

18. I agree with the majority that Sister McDonough would fall within the "ministerial exception," as we earlier described it in *Minker*, once

Action on plaintiff's discrimination claim would require the Court to anticipate and, in effect, preempt the decision-making authority of the Vatican, which is ultimately responsible for selecting tenured professors in the Catholic University ... Department of Canon Law.

856 F.Supp. at 8. Because the ultimate authority's decision regarding Sister McDonough's tenure pursuit is beyond judicial review, whether any relief we might grant her at this stage will eventually and finally redress her injury is similarly within the exclusive control of the Holy See.[19]

her tenure application reached the ecclesiastical authorities, that is, at the *"nihil obstat"* stage.

19. Indeed, in deciding to bifurcate the trial, the district court expressed doubt about the court's ability to grant the requested relief. JA 170. Originally Sister McDonough argued that the district court could order that she be granted tenure. *See Complaint in Intervention and Jury Demand*, JA 35; Trial Tr. vol. I at 10. At the conclusion of the liability stage and in the very last document filed in the district court, Sister McDonough sought to limit her requested remedy:

> [S]ince the canon law candidates for tenure must receive the canonical mission or nihil obstat as the final step toward tenure, if this Court finds that the University violated Title VII, it can fashion an equitable remedy. For example, the Court can make a finding of discrimination, award damages and order reinstatement and a positive endorsement for

tenure by the non-ecclesiastical bodies, so that Sister Elizabeth's tenure application is placed before the Chancellor and episcopal members of the Board of Trustees for the "nihil obstat" review.

*Plaintiffs' Reply to Defendant's Post Trial Brief* at 14.

Title VII expressly authorizes "any ... equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). The district court did not reach the question of remedy, however, because it dismissed the case at the liability stage. Accordingly, it did not reach the issue whether equitable relief under Title VII could include the remedy Sister McDonough suggested as an alternative. *Cf. Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1511 (D.C.Cir.1989) (holding that although plaintiff's military promotion request was "nonjusticiable" and thus properly dismissed by district court his "more modest request" for "corrective action with respect to appellant's record" was justiciable under Administrative Procedure Act).